UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CARMENCITA BRUNO,

                            Plaintiff,

v.                                                          1:12-CV-0285
                                                            (GTS/DJS)
CITY OF SCHENECTADY; CITY OF
SCHENECTADY POLICE DEPARTMENT;
THOMAS MATTICE, Police Officer; JOHN DOE
#1, Police Officer; JOHN DOE #2, Police Officer;
JOHN DOE #3, Police Officer; JANE DOE, Police
Officer; MICHAEL DELLAROCCO, Fire
Chief/Captain; and FAARSTAD, Fire Department
Chief;

                            Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

OFFICE OF CARMENCITA BRUNO            CARMENCITA BRUNO, ESQ.
  Plaintiff, *Pro Se*
P.O. Box 64
Howes Cave, NY 12092

CARTER, CONBOY, CASE, BLACKMORE,     MICHAEL J. MURPHY, ESQ.
MALONEY & LAIRD, P.C.                 BRIENNA L. CHRISTIANO, ESQ.
  Counsel for Defendants
20 Corporate Woods Boulevard
Albany, NY 12211

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this *pro se* civil rights action filed by Carmencita Bruno

("Plaintiff") against the City of Schenectady, the City of Schenectady Police Department,

Thomas Mattice, Michael DellaRocco, Fire Chief Faarstad, and unidentified John and Jane Doe

members of the Schenectady Police Department, is Defendants' motion for summary judgment.

(Dkt. No. 217.)  For the reasons set forth below, Defendants' motion is granted.

## I.    RELEVANT BACKGROUND

### A.    Plaintiff's Amended Complaint

In her Amended Complaint, Plaintiff asserted a number of claims, including claims of

municipal liability pursuant to 42 U.S.C. § 1983, denial of her right to counsel pursuant to the

Sixth Amendment, denial of her right to free speech pursuant to the First Amendment, use of

excessive force pursuant to the Fourteenth Amendment, false arrest pursuant to the Fourth and

Fourteenth Amendments, deprivation of property without due process of law pursuant to the

Fifth and Fourteenth Amendments, false imprisonment pursuant to New York law, negligence

pursuant to New York law, negligent supervision pursuant to New York law, trespass pursuant to

New York law, conversion pursuant to New York law, and battery pursuant to New York law.

(Dkt. No. 8, at ¶¶ 137-278 [Pl.'s Am. Compl.].)  The Court has also construed Plaintiff's

Amended Complaint as asserting a claim for deliberate indifference to serious medical needs

pursuant to the Fourteenth Amendment.  (Dkt. No. 56, at 32-33 [Decision and Order filed Feb.

20, 2014].)  As will be discussed below in Part I.B. of this Decision and Order, the only claims

surviving a prior Decision and Order of the Court are Plaintiff's claims for deliberate

indifference to her serious medical needs and municipal liability based on that alleged deliberate

indifference.

### B.    Procedural History

Because of the lengthy procedural history of this case, the Court finds it appropriate to

briefly summarize the events leading to Defendants' current motion.  In decisions dated February

20, 2014, and March 14, 2016, the Court dismissed all of Plaintiff's claims. (Dkt. No. 56 [Decision and Order filed Feb. 20, 2014]; Dkt. No. 134 [Decision and Order filed Mar. 14, 2016].) Plaintiff filed a notice of appeal to the United States Court of Appeals for the Second Circuit. (Dkt. No. 136.) On June 15, 2018, the Second Circuit filed a mandate affirming all of the Court's findings except the finding that Plaintiff had failed to plausibly allege a claim of deliberate indifference to her serious medical needs pursuant to the Fourteenth Amendment. (Dkt. No. 149, at 5-7 [Mandate filed June 15, 2018].) In rendering this ruling, the Second Circuit noted that this Court applied a subjective standard for assessing deliberate indifference rather than the objective standard required by *Darnell v. Pineiro*, 849 F.3d 17 (2d Cir. 2017); the Second Circuit specifically remanded for consideration under the proper objective standard. (*Id.* at 6.) The Second Circuit also determined that Plaintiff had plausibly alleged the existence of a serious medical condition at the time of her arrest based on her allegations that the officers' actions at the scene aggravated her pre-existing traumatic brain injury ("TBI"). (*Id.* at 6-7.)

In accordance with the Second Circuit's order, on June 28, 2018, this Court granted Defendants' motions to reopen discovery (specifically as to Plaintiff's deliberate indifference claim) and to allow for the parties to file further motions. (Dkt. No. 155.) On March 6, 2019, Plaintiff filed a motion to amend her Amended Complaint (in part to substitute specific individuals for the John and Jane Doe Defendants), which was denied by U.S. Magistrate Judge Daniel J. Stewart on April 26, 2019. (Dkt. Nos. 201, 209.) On May 10, 2019, Plaintiff appealed that decision, and, on July 1, 2019, the undersigned affirmed Magistrate Judge Stewart's decision. (Dkt. Nos. 211, 223.)

On May 30, 2019, Defendants filed the current motion for summary judgment that is the

subject of this Decision and Order.  (Dkt. No. 217.)

### C. Undisputed Material Facts on Defendants' Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and either expressly admitted by Plaintiff in her response thereto or not denied with appropriate record citations supporting such a denial.  (*Compare* Dkt. No. 217, Attach. 21 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 232 [Pl.'s Rule 7.1 Resp.].)

<u>Plaintiff's Background</u>

1.    Plaintiff is a self-employed lawyer who is admitted to practice in the State of New York and in the United States District Court for the Northern District of New York.

2.    Plaintiff admits that she had difficulty in passing the New York State Bar Examination and that she had to repeat it three times.

3.    Eventually, Plaintiff underwent a neuropsychological evaluation in 2006 with Dr. Edward Hickling in order to determine whether or not she needed additional time in completing the State Bar Examination; she was given extra time.

<u>Plaintiff's Pre-existing Injuries</u>

4.    In April 2010, Plaintiff was involved in a motor vehicle accident in which her vehicle was struck by another vehicle, causing her to lose consciousness.

5.    As a result of the motor vehicle accident, Plaintiff sustained a host of physical injuries and symptoms including a concussion, TBI, wrist injury, left-arm burning sensation, headaches, and whiplash.

6.    Plaintiff had only one active case on behalf of a client at the time of the motor

vehicle accident (a foreclosure action), which was resolved by a decision from the relevant court in May 2010.

7.     Plaintiff's attorney, Michael Mackey, represented her in connection with her claim against the vehicle operator in her motor vehicle accident and negotiated a settlement for the policy amounts.

8.     Plaintiff claims that she was diagnosed with, and received treatment for, TBI.

9.     Plaintiff was treated by Dr. Hamish Kerr, who advised her against practicing law due to her short-term memory loss.

10.     She was referred to neuropsychology and Sunnyview Rehabilitation for continued treatment for speech, sight, and physical coordination difficulties related to her TBI, including occupational and physical therapy.

11.     Plaintiff had been approved for Social Security Disability benefits following her motor vehicle accident, and before November 2010.

<u>The November 17, 2010, Fire</u>

12.      At the time of the November 17, 2010, fire, Plaintiff had been residing at a rented house located at 1626 Becker Street in Schenectady, New York, with her eight dogs Osa, Satin, Sheen, Rascal, Spotsza, Geno, Sheena, and Silk.

13.     Plaintiff had been residing at this address for approximately four years before the November 17, 2010, fire.

14.     On the morning of November 17, 2010, Plaintiff left her home at 8:00 a.m., for an MRI scan at St. Clare's/Ellis Hospital.

15.     After the MRI scan, Plaintiff visited her acupuncturist, Maria Bergan.

16.     Plaintiff left Ms. Bergan's office about an hour later, stopped for groceries, and returned home by bus.

17.     Plaintiff testified that she arrived home between 6:00 p.m., and 7:00 p.m., that evening.

18.     Plaintiff first became aware of the fire at her house when she saw several fire trucks and a crowd gathered near her building.

19.     Plaintiff ran to the Chief of the Fire Department and said, "[m]y babies, my babies" (referring to her dogs), and requested that the firefighters attempt to rescue her dogs.

20.     The Chief informed her that her dogs were all dead, but Plaintiff continued to demand that the firefighters rescue her dogs.

21.     The Chief then ordered police officers to remove Plaintiff from the scene.

22.     The area had been taped off by the police as a possible crime scene and Plaintiff was told not to cross the police tape.

23.     Plaintiff was warned that she would be arrested if she failed to remain behind the police tape.

24.     Plaintiff had to be physically taken behind the police tape by Defendant Mattice and a second officer.

25.     Plaintiff was directed several times to stay behind the police tape.

26.     Plaintiff continued to disregard Defendant Mattice's order to stay behind the police tape.

27.     Plaintiff was placed under arrest and charged with obstruction of governmental administration in the second degree pursuant to N.Y. Pen. L. § 195.05, and resisting arrest

pursuant to N.Y. Pen. L. § 205.30.

28.     Plaintiff claims that the arresting officer grabbed and twisted her hands and placed her in handcuffs, causing her pain in her left wrist.

29.     Plaintiff resisted arrest by refusing to comply with the directive from Defendant Mattice to place her hands behind her back.

30.     Defendant Mattice took her wrists, brought them behind her back, and handcuffed her.

31.     Following her arrest, Plaintiff claims that she "froze as the result of a combination of fear, shock and an ongoing medical condition" and "could not move."

32.     Patrol Officer Nicholas Giordano and Defendant Mattice escorted Plaintiff away from the scene (crossing the police tape running across Becker Street) and approached the patrol vehicle.

33.     Plaintiff claims that Defendant Mattice and another police officer picked her up and threw her into the police car, such that she felt a bobbing sensation and could not 'feel' her feet, causing her to "suffer bruising and other injuries and aggravation of pre-existing injuries."

34.     Specifically, Plaintiff alleges that she sustained bruising to her left thigh, arms, and wrist.

35.     Plaintiff also alleges that she sustained humiliation and degradation because she was arrested in the presence of her neighbors.

36.     However, Plaintiff was not manhandled by Defendant Mattice or any other police officer at any time during her arrest.

37.     Defendant Mattice directed Plaintiff to enter the patrol vehicle, and she eventually

complied.

38.     Plaintiff was taken to the police station about three minutes after she was placed in the patrol vehicle.

39.     The drive to the police station from the scene took approximately six minutes.

40.     After bringing Plaintiff to the police station, Defendant Mattice did not have any further interactions with Plaintiff.

41.     Plaintiff did not tell Defendant Mattice or Patrol Officer Nicholas Giordano that she had been previously treated for a TBI.[1]

42.     Video footage taken of Plaintiff's arrest on November 17, 2010, does not depict Plaintiff complaining to anyone at the scene about having a prior TBI.[2]

### Detention at the City of Schenectady Police Department

43.     Police matron Marby Reyes arrived for her shift at the Police Department at 3:00

---

[1]     Plaintiff denies this asserted fact, citing to "[u]nintelligible portions" of the audio from the dashboard camera video, particularly around "the time she was being asked for license and whereabouts." (Dkt. No. 232, at ¶ 60 [Pl.'s Rule 7.1 Resp.].)  However, this assertion is not sufficient to create a genuine dispute of material fact as to this asserted fact for three reasons: (1) unintelligible portions of the audio cannot support her assertion because a rational factfinder could not tell one way or the other what was or was not said from unintelligible audio; (2) a rational factfinder could not hear any statements directly related to a head injury or TBI in the portions of the audio that are intelligible; and (3) Plaintiff has failed to cite any other evidence to support her assertion that she told officers that she was previously treated for a TBI at the relevant time.  For these reasons, this asserted fact is deemed admitted.

[2]     Plaintiff denies this asserted fact, but that denial is ineffective for the reasons discussed above in note 1 of this Decision and Order.  The Court has however found that the portion of this fact stating that the video does not show Plaintiff telling anyone that she had undergone medical treatment that day must be omitted as disputed based on Plaintiff's statement in the video that she "was (at or in) the hospital all day." (Dkt. No. 217, Attach. 20, at 6 [DVD Exhibit, Video 2, 25.18].)  Although not a clear statement that she had received medical treatment, it raises a sufficient question as to what notice the officers had of her medical status at the time of the arrest.

p.m., on November 17, 2010.

44.　　Ms. Reyes recalled hearing over the radio that a female had been arrested and would be brought to the station.

45.　　Plaintiff arrived at the police station at 18:30 (6:30 p.m.).

46.　　Once Plaintiff arrived at the police station, Ms. Reyes removed Plaintiff's handcuffs and brought her to her office.

47.　　Ms. Reyes observed that Plaintiff was crying, screaming, agitated, and not able to listen to any directives; Ms. Reyes tried to help Plaintiff calm down.

48.　　Ms. Reyes began asking Plaintiff about her background and filling out her intake paperwork.

49.　　Ms. Reyes testified that the concern when Plaintiff was in her office was emotional rather than medical.[3]

50.　　Once the intake paperwork was completed, Ms. Reyes brought Plaintiff to a cell.

51.　　When Plaintiff was placed in the cell, she was still crying loudly and screaming.

52.　　The Cell Block Log, written by Ms. Reyes, states the following:

> Ms. Bruno was arrested at the scene of a fire. Ms. Bruno was in such a distraught state that is was very hard to go through the intake process. Ms. Bruno was almost manic, crying, and shouting, very upset about her dogs . . . Continuously yelling sitting on floor inside cell. Desk was notified of situation[;] I was informed that once Ms. Bruno had been booked she will

---

[3]　　Plaintiff denies this asserted fact, citing various evidence about how her condition deteriorated during her time at the police station. (Dkt. No. 232, at ¶ 68 [Pl.'s Rule 7.1 Resp.].) This denial is ineffective for two reasons: (1) whether Plaintiff's condition deteriorated after being placed in the cell (i.e., after she left Ms. Reyes' office) is not the subject of this asserted fact; and (2) none of the evidence cited by Plaintiff contradicts the assertion that the above-described testimony was Ms. Reyes' testimony. This fact is therefore deemed admitted.

9

be issued an appearance ticket and sent to hospital for medical care.  Ms. Bruno was told repeatedly that although she was upset she should try to calm down and that if she was able to do that she would get her phone call."

53.     The Cell Block Log reflects that Ms. Reyes performed a check on Ms. Bruno at 18:50 (6:50 p.m.).[4]

54.     Ms. Reyes checked on Ms. Bruno again at 19:05 (7:05 p.m.).

55.     Ms. Reyes checked on Ms. Bruno again at 19:20 (7:20 p.m.).

56.     Ms. Reyes checked on Ms. Bruno again at 19:35 (7:35 p.m.).

57.     A note from five minutes after Ms. Reyes' last check states that "@ 1940 this matron heard a noise got up and Ms. Bruno appeared to be unconscious.  Paramedics were called, while waiting for paramedics Ms. Bruno appeared to start having seizures.  Paramedics arrived."

58.     Ms. Reyes testified that she saw Plaintiff fall while observing a monitor on her desk that showed surveillance footage of Plaintiff's cell.

59.     Ms. Reyes testified that she was "continuously monitoring" Plaintiff (on the monitor) while she was in the cell.

60.     Once Ms. Reyes saw Plaintiff fall, she called the desk sergeant and indicated that

---

[4]     Plaintiff denies this asserted fact, arguing that such inference cannot be made based on the cited evidence because it is unclear what "N" (the marking that Ms. Reyes placed in the box under the relevant time) actually means.  (Dkt. No. 232, at ¶ 72 [Pl.'s Rule 7.1 Resp.].) However, the Court finds Plaintiff's denial insufficient because, even if the meaning of the "N" is ambiguous, the various times are listed in a section entitled "Time of Inspection and Condition" (Dkt. No. 217, Attach. 6, at 6.)  Given that the asserted fact discusses only the time Ms. Reyes inspected the cell, the cited evidence supports that asserted fact.  This asserted fact is therefore deemed admitted.

paramedics should be called.[5]

61.     The desk sergeant responded that he would call the paramedics.

62.     Ms. Reyes reported to the desk sergeant that Plaintiff had complained that her head hurt and that she was dizzy.

63.     The certified Mohawk Ambulance record shows that it received a call at 19:44 (7:44 p.m.).

64.     Paramedics from Mohawk Ambulance arrived at the scene at 19:48 (7:48 p.m.).

65.     The Cell Block Log reflects that, at 19:47 (7:47 p.m.), Plaintiff went from police custody to the care of the paramedics.

66.     The Cell Block Log reflects that, at 20:00 (8 p.m.), Plaintiff was transported from the police station to the hospital.

67.     Plaintiff was transported to Ellis Hospital at 20:02 (8:02 p.m.).

### Medical Treatment at Ellis Hospital

68.     Plaintiff arrived at Ellis Hospital at 20:07 (8:07 p.m.).

69.     Plaintiff was admitted to Ellis Hospital at 20:14 (8:14 p.m.).

70.     Plaintiff was discharged from Ellis Hospital the next morning.

---

[5]     Plaintiff denies this asserted fact, arguing that Ms. Reyes "ran into the cell and held up Bruno's head from [sic] keeping it from banging," presumably before she called the desk sergeant.  (Dkt. No. 232, at ¶ 81 [Pl.'s Rule 7.1 Resp.].)  However, in support of this denial Plaintiff cites simply to Exhibit O without specifying any pages.  Given that Exhibit O consists of 196 pages, this non-specific citation is not sufficient to enable this Court to determine whether Plaintiff's denial is supported.  N.D.N.Y. L.R. 7.1(a)(3) (requiring "*specific* citation to the record") (emphasis added).  Additionally, statements on page 134 of Exhibit O contradict Plaintiff's assertion.  (Dkt. No. 217, Attach. 16, at 135 [Reyes Dep.] [stating that she heard a noise, saw Plaintiff on lying on the floor, then called the desk sergeant, after which she went into the cell and tried to hold Plaintiff's head].)  As a result, this asserted fact is deemed admitted.

71. The triage form from the Emergency Department at Ellis Hospital indicates that Plaintiff had suffered from a syncopal episode at the jail upon finding out that her dogs had died.[6]

72. A physical examination was completed by the attending physician and emergency personnel; however, no observable injuries or bruising were noted in her medical records.[7]

73. A CT scan ordered by Plaintiff's attending physician revealed no internal bleeding or other anomalies.

74. Plaintiff was diagnosed with "grief reaction" and transferred to the Crisis Unit at Ellis Hospital at the request of her attending physician, where she remained until the following morning.

75. Plaintiff was given an appearance ticket for the following morning and released from custody.

### D. Parties' Briefing on Defendants' Motion for Summary Judgment

#### 1. Defendants' Memorandum of Law

Generally, in their motion for summary judgment, Defendants assert three arguments. (Dkt. No. 217, at 6-18 [Defs.' Mem. of Law].) First, Defendants argue that Plaintiff's remaining claim must be dismissed because she has not alleged or established personal involvement in the

---

[6]     Plaintiff denies this asserted fact, stating that she was told her dogs had died while still at the scene of the fire, not in the jail immediately before her syncopal episode, and that this misstatement is the result of "a controlled narrative" by the police. (Dkt. No. 232, at ¶ 92 [Pl.'s Rule 7.1 Resp.].) Plaintiff's denial is ineffective because the asserted fact addresses merely what the Emergency Department triage form says. This asserted fact is therefore deemed admitted.

[7]     Plaintiff denies this asserted fact, pointing to a notation in the cited record that notes a "direct blow" to her head. (Dkt. No. 232, at ¶ 93 [Pl.'s Rule 7.1 Resp.].) Plaintiff's denial is ineffective because, although a head injury as a result of a fall was *reported*, the actual physical examination showed "no obvious injury" of her head. (Dkt. No. 217, Attach. 12, at 16.) This asserted fact is therefore deemed admitted.

asserted constitutional violation by any of the remaining named Defendants. (*Id.* at 6-8.) More specifically, Defendants argue that Plaintiff has not established any denial of medical care by Defendant Mattice (who was not involved in Plaintiff's custody after she arrived at the police station), and that Plaintiff has not asserted any claims against the individuals who were working at the police station, noting in particular that Plaintiff's requests to add individuals such as Ms. Reyes (the matron on duty the night of Plaintiff's arrest) as defendants were denied by this Court. (*Id.*)

Second, Defendants argue that, in the alternative, Plaintiff has not shown that Defendants were deliberately indifferent to any serious medical need. (*Id.* at 9-16.) More specifically, Defendants argue the following: (a) there was no sufficiently serious deprivation of medical care because a single fainting episode is not a sufficiently serious injury, and this episode was related to grief over the death of her dogs rather than any physical injury; (b) Plaintiff had not informed Defendant Mattice and Officer Giordano that she had a TBI at any time, and there was no evidence that she suffered any head injuries as a result of those officers' actions; and (c) Ms. Reyes did not unreasonably deny Plaintiff medical care because she reported to the desk sergeant that Plaintiff had been complaining that her head hurt, she monitored Plaintiff through a video camera and physically checked on Plaintiff approximately every 15 minutes before Plaintiff's syncopal episode occurred, she indicated that Plaintiff would be sent to the hospital after an appearance ticket was issued, and she had the desk sergeant call the paramedics almost immediately after she discovered that Plaintiff had fallen.

Third, Defendants argue that Plaintiff has failed to establish municipal liability against Defendants City of Schenectady and City of Schenectady Police Department because (a) she has

failed to allege or prove any policy or custom that caused the alleged deliberate indifference, (b) she has failed to allege or prove any way in which either of these two Defendants failed to adequately train their officers, and (c) there has been no showing of a constitutional violation, and thus there is no other basis for municipal liability. (*Id.* at 16-18.)

### 2. Plaintiff's Opposition Memorandum of Law

Generally, in opposition to Defendants' motion, Plaintiff asserts nine arguments. (Dkt. No. 232, Attach. 1, at 17-64 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that Defendant Mattice's affidavit should be found to be inadmissible because it includes materially false statements. (*Id.* at 17-23.) More specifically, Plaintiff argues that Defendant Mattice's statement that he did not know that Plaintiff was under medical treatment at the time of the arrest is contradicted by the dashcam video in which she told officers she was under medical treatment and had been at the hospital earlier that day. (*Id.*)

Second, Plaintiff argues that, because the dashcam video contains portions of audio that are unintelligible, any ambiguity as to the facts created as a result of that unintelligibility should be resolved in her favor on this motion for summary judgment. (*Id.* at 23-25.) Plaintiff also appears to argue that the Court should exclude this video from evidence because the fact that some parts of the audio are unintelligible is unfairly prejudicial to her in that it would require a factfinder to speculate as to the content. (*Id.*)

Third, Plaintiff argues that Defendants failed to comply with the written notice requirement of Fed. R. Evid. 901(11) with regard to their intent to offer Mr. Brandow as an expert and the dashcam videos as business records, adding that the fact that Defendants had offered this evidence on a previous motion does not negate the notice requirement. (*Id.* at 25.)

Plaintiff argues that, had she known this evidence would be offered again on this motion, she would have deposed Mr. Brandow. (*Id.*)

Fourth, Plaintiff argues she should be able to offer information from government and news websites to oppose Defendants' motion because they are self-authenticating and because Defendants have resisted her efforts to obtain pertinent information. (*Id.* at 25-28.)

Fifth, Plaintiff argues that permitting Defendants to offer fabricated evidence would result in a deprivation of her constitutional right to trial by jury, and that Defendant Mattice's affidavit is in any event insufficient to support a grant of summary judgment for Defendants because she has testified (contrary to his assertions) that she informed him of her TBI. (*Id.* at 28-33.)

Sixth, Plaintiff argues that Defendant Mattice and Officer Giordano were aware that she had a medical condition based on her statements to them at the scene of the fire, but that they exposed her to an unreasonable risk of harm by bringing her to the police station without checking whether she needed medical care and by failing to communicate information about her condition to the employees at the police station. (*Id.* at 33-36.) Plaintiff also argues that police station employees were deliberately indifferent to her serious medical needs in that she informed them about her TBI, but they ignored her symptoms. (*Id.*)

Seventh, Plaintiff argues that she has established a claim for deliberate indifference because she has shown that she had a serious medical condition requiring medical attention that Defendants ignored. (*Id.* at 36-43.) More specifically, Plaintiff argues the following: (a) she informed Defendant Mattice and Officer Giordano that she had a TBI and had been at the hospital all day; (b) Defendant Mattice and Officer Giordano ignored her obvious symptoms such as extreme mental anguish, shaking, screaming, disorientation, and repetitive speech; (c) Ms.

Reyes also ignored her symptoms that reasonably indicated a need for medical attention despite her awareness that Plaintiff required medical attention, as evidenced by her statement that she would have Plaintiff sent to the hospital after an appearance ticket was issued; and (d) the failure to provide medical care posed significant risks to her health and resulted in pain, mental anguish, loss of consciousness, and a second head injury. (*Id.*)

Eighth, Plaintiff notes that the Court *sua sponte* vacated a December 2007 order in May 2015 using its inherent powers to correct mistakes and argues that the Court should now use its inherent power to reverse course on its previous decision denying Plaintiff permission to amend her Amended Complaint, making the following points in particular: (a) the Court erred in finding that she had not exercised due diligence in seeking those amendments; (b) the Court erred in denying her motion to amend to add the additional John and Jane Doe parties; (c) Defendants had a duty to supplement discovery even after the discovery period ended, with which they did not comply; (d) the deposition of Ms. Reyes brought the existence of a desk sergeant file to Plaintiff's attention for the first time, but Defendants have refused to provide this evidence and the Court denied her request to have it produced; and (e) Defendants have not shown that they would have been prejudiced by Plaintiff's proposed amendments. (*Id.* at 43-61.)

Ninth, Plaintiff argues that Defendants City of Schenectady and City of Schenectady Police Department should be held liable as municipalities for the alleged constitutional violations of its officers for the following reasons: (a) they have a "widespread practice, express or otherwise, authorizing acts of reckless disregard" as to following written general orders; (b) they failed to supervise the implementation of training about crisis intervention (i.e., dealing with citizens with mental health issues in crisis), noting that there have previously been situations that

were similarly mishandled by officers, and they failed to provide training for dealing with individuals with mental illness; (c) the City of Schenectady Police Department had a policy that only supervisors could call EMS for medical services; and (d) the City of Schenectady Police Department failed to adequately train officers and employees in that it did not punish employees who disregarded City policies and general orders. (*Id.* at 61-64.)

### 3.    Defendants' Reply Memorandum of Law

Generally, in reply to Plaintiff's opposition, Defendants assert five arguments. (Dkt. No. 238, at 2-16 [Defs.' Reply Mem. of Law].) First, Defendants argue that Plaintiff has failed to adduce any evidence sufficient to create a genuine dispute of material fact, noting that (a) she has produced only her own affidavit in support of her assertions, (b) she has failed to submit any treatment records from after the alleged incident substantiating her claim that she suffered a second TBI as a result of Defendants' actions, and (c) she has failed to submit any evidence to support her assertion that medical care was not provided in a reasonably prompt manner, noting in particular that her statement to officers that she had "been in the hospital all day" does not suffice to support her assertion that officers were aware of the specifics of her medical condition. (*Id.* at 2-7.)

Second, Defendants argue that the material facts asserted in Defendants' Rule 7.1 Statement should be deemed admitted because Plaintiff's responses are either non-responsive or do not cite record evidence in support of any denials. (*Id.* at 7-10.)

Third, Defendants argue that Plaintiff's arguments seeking to exclude certain evidence are improper, both procedurally and substantively, because (a) the dashcam video has been considered by this Court in the past, and there is no reason to exclude it now given that Plaintiff

has had ample opportunity to question Mr. Brandow as the authenticator of that video evidence throughout the course of this litigation, and (b) the video does not substantiate Plaintiff's claims that she told Defendant Mattice that she had a TBI or the reason for her having been in the hospital on the day of the fire, and there is no evidence to support her assertion that Defendant Mattice lied in his affidavit. (*Id.* at 10-14.)

Fourth, Defendants argue that Plaintiff's attempt to re-challenge the denial of her motion to amend her Amended Complaint is improper. (*Id.* at 14-15.)

Fifth, and finally, Defendants argue that Plaintiff's claim for municipal liability must be dismissed because she has not identified any relevant policy, much less established that such policy caused the claimed depravation of her constitutional rights. (*Id.* at 15-16.)

## II.     LEGAL STANDARD GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[8] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In determining whether a genuine issue of material fact exists, the Court must resolve all

---

[8]     As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).[9]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute–even if that non-movant is proceeding *pro se*.[10] (This is because the Court extends special solicitude to the *pro se* litigant by ensuring that he or she has received notice of the consequences of failing to properly respond to the motion for summary judgment.)[11] As has often been recognized by both the Supreme Court and Second Circuit, even *pro se* litigant must obey a district court's procedural rules.[12]

Of course, when a non-movant willfully fails to respond to a motion for summary

---

[9]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[10]     *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 426 & n.2 (N.D.N.Y. 209) (Suddaby, J.) (citing cases).

[11]     *Cusamano*, 604 F. Supp. 2d at 426 & n.3 (citing cases).

[12]     *Cusamano*, 604 F. Supp. 2d at 426-27 & n.4 (citing cases).

judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.); N.D.N.Y. L.R. 7.1(b)(3). What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement[13]–even where the non-movant was proceeding *pro se*.[14]

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3).[15] Stated another way, when a non-movant fails to oppose a legal argument

---

[13]     Among other things, Local Rule 7.1(a)(3) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 7.1(a)(3).

[14]     *Cusamano*, 604 F. Supp. 2d at 427 & n.6 (citing cases).

[15]     *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's

asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III.    ANALYSIS

### A.    Whether the Court Should Reconsider Its Findings on Plaintiff's Motion to Amend

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' reply memorandum of law. (Dkt. No. 238, at 14-15 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

As discussed above in Part I.B. of this Decision and Order, Plaintiff's motion to amend her Amended Complaint was denied by Magistrate Judge Stewart, and the undersigned affirmed that denial, finding that Magistrate Judge Stewart's finding that the proposed amendments did not relate back to the Complaint (and thus were time-barred) was not clearly erroneous. (Dkt. No. 223, at 7-13 [Decision and Order filed July 1, 2019].) To the extent that Plaintiff is now raising the same arguments that she raised as part of that motion, the Court finds no reason to reconsider its previous findings. Additionally, to the extent that Plaintiff has raised additional arguments not made as part of that motion, this motion for summary judgment is not the

---

failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

appropriate place to raise those arguments for the first time. The Court's prior ruling has become "the law of the case"; Plaintiff's request to depart from that law (which is untimely pursuant to Local Rule 7.1[g]) is unsupported by an intervening change in controlling law, new evidence, or the need to correct a clear error of law or prevent manifest injustice.

For these reasons, the Court declines to consider Plaintiff's arguments relating to her motion to amend the Amended Complaint.

**B.    Whether the Court Should Exclude Certain Evidence Identified by Plaintiff**

After careful consideration, the Court answers this question in the negative for the reasons stated in Defendants' reply memorandum of law. (Dkt. No. 238, at 10-14 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

As stated above in Part I.D.2. of this Decision and Order, as to the dashcam videos, Plaintiff objects to the admissibility of this evidence for three reasons: (1) portions of the audio within the videos are unintelligible, which would require a jury to speculate as to what was being said in that audio and would result in the inability to create a transcript of that audio; (2) the videos are of questionable authenticity because there is no chain-of-custody information provided and Defendants did not provide sufficient notice that it intended to offer Mr. Brandow (as custodian of the videos) as an expert; and (3) allowing a factfinder to hear and consider the videos would be prejudicial to Plaintiff due to the unintelligibility of important portions of those videos. (Dkt. No. 232, Attach. 1, at 23-25 [Pl.'s Opp'n Mem. of Law].)

First, it is well established in this Circuit that "a recording that is partially inaudible is generally admissible unless the unintelligible portions are so substantial as to render the entire recording untrustworthy." *United States v. Walker*, 922 F. Supp. 732, 759 (N.D.N.Y. 1996)

(Munson, J.) (citing *United States v. Arango-Correa*, 851 F.2d 54, 58 [2d Cir. 1988]); *accord*

*United States v. Vasconcellos*, 658 F. Supp. 2d 366, 398 (N.D.N.Y. 2009) (Sharpe, J.).[16]

Additionally, there is "a clear preference for the admission of recordings notwithstanding some

ambiguity or inaudibility, as long as the recordings are probative." *Arango-Correa*, 851 F.2d at

58 (collecting cases). The videos and audio are clearly probative; they provide the best

indication of the course of events and statements made from before Plaintiff's arrest to when she

arrived at the police station. Defendant Mattice is the only individual involved in the remaining

substantive constitutional claim who is still a Defendant in this action, and the videos cover

essentially the entire interaction between Plaintiff and Defendant Mattice. Furthermore, only a

very small portion of the audio is unintelligible and there is no indication that those parts in

particular are so important that they would render the entirety of the videos inadmissible.

Although Plaintiff appears to have asserted at various times that Defendant Mattice and Officer

Giordano contributed to the unintelligibility of the portions of the audio where she told them she

had a TBI and had undergone medical treatment by turning down the volume on their devices,

Plaintiff has offered no evidence to support that speculative assertion. Similarly, there is no

evidence to support Plaintiff's assertions that the unintelligible portions of the audio would have

supported her claim had they been intelligible. Under the circumstances, the Court finds no

reason to exclude the video evidence from consideration on the basis of the unintelligible

---

[16]      The Court notes that Plaintiff's argument for excluding the video relies on a
standard of whether the recording is so unintelligible that it would require the jury to speculate as
to its contents. (Dkt. No. 232, Attach. 1, at 23-24 [Pl.'s Opp'n Mem. of Law].) However, that is
the standard under New York law, not federal law. *See Lanza v. Lewin*, 04-CV-0678, 2008 WL
4104454, at *19 (N.D.N.Y. Sept. 3, 2008) (Kahn, J.) (discussing this standard as one arising
under New York law). That standard is therefore inapplicable in this litigation.

portions.

Second, Plaintiff's challenges to the authenticity of the videos are without merit. Defendants have provided testimony from Mr. Brandow, the in-car video technician for the City of Schenectady Police Department, who affirmed in an affidavit that (a) he was familiar with the Department's in-car video cameras in use on November 17, 2010, (b) the submitted videos were made and maintained in the regular course of business, (c) the DVD on which the footage was originally captured was removed from the patrol vehicle by the Supervisor, who wrote the date, time, and his initials on the disc and stored the disc in a locked safe in the booking area, (d) he personally retrieved the disc from the booking area safe and stored it in the locked safe in this office, (e) on June 21, 2011, he made a copy of the original DVD, and (f) the copy submitted with his affidavit is a true and accurate copy of the video from November 17, 2010. (Dkt. No. 217, Attach. 20, at 8-9 [Brandow Aff.].) Such statements satisfy the requirements for authenticating evidence in Fed. R. Evid. 901(b)(1).

To the extent that Plaintiff argues that she was not afforded proper notice of the intent to offer the videos as self-authenticating evidence under Fed. R. Evid. 902(11), that argument is also meritless. As Defendants argue, they have previously submitted the videos as evidence on a motion for summary judgment as far back as September 2015. (Dkt. Nos. 100, 103.) Plaintiff therefore has certainly had a fair and full opportunity to inspect the videos and challenge them in the intervening four years between that motion and the current motion. Nor is the Court convinced that Plaintiff has been denied a reasonable opportunity to conduct a deposition of Mr. Brandow had she wished to so. Additionally, Fed. R. Evid. 902(11) explicitly requires only that Defendants must give Plaintiff notice "[b]efore the trial or hearing"; because no trial has yet

occurred in this litigation, the Court fails to see how Defendants' failure to provide some sort of explicit written notice before they filed their current motion for summary judgment puts them afoul of this rule. Furthermore, even if Defendants' actions in providing notice rendered the video evidence non-self-authenticating, such fact does not mean that the video evidence must be excluded; rather, as already discussed, Mr. Brandow's affidavit sufficiently authenticates that video evidence.

Third, the Court finds that, for many of the reasons already discussed above, the probative value of the dashcam videos outweighs any potential prejudice to Plaintiff that might be caused by the fact that some portions of the audio are difficult to hear; the fact that the video may not have captured something that might support Plaintiff's claim does not render the videos either non-probative or unduly prejudicial. Fed. R. Evid. 401, 403.

As to Defendant Mattice's affidavit, there is no evidence substantiating Plaintiff's assertion that Defendant Mattice lied in stating that Plaintiff never informed him that she had undergone medical treatment prior to arriving at the scene of the fire. Although the dashcam videos support a finding that she told Defendant Mattice that she had "been [at/in] the hospital all day," they do not appear to show that Plaintiff ever elaborated on why she had been at the hospital or that she ever specifically informed Defendant Mattice that she had a TBI and had been receiving treatment specifically for that injury. Because her statement that she had been at the hospital all day does not compel a finding that she had been receiving medical treatment (as opposed to achieving some other task such as visiting a patient or performing work), the Court cannot say Defendant Mattice's statement that Plaintiff never informed him that she had undergone medical treatment before arriving at the scene of the fire constitutes perjury. Rather, it

is merely a disputed question of fact. As a result, there is no basis for excluding Defendant Mattice's affidavit from consideration.

For all of the above reasons, the Court rejects Plaintiff's arguments seeking exclusion of the video evidence and Defendant Mattice's affidavit; the Court may consider this evidence in deciding the merits of Defendant's motion for summary judgment.

### C. Whether Defendants Are Entitled to Summary Judgment Based on Lack of Personal Involvement in the Alleged Deliberate Indifference to Her Serious Medical Needs

After careful consideration, the Court answers this question in the affirmative as to Defendants DellaRocco and Faarstad, for the reasons stated in Defendants' memorandum of law, but in the negative as to Defendant Mattice. (Dkt. No. 217, Attach. 22, at 6-8 [Defs.' Mem. of Law].) To those reasons, the Court adds the following analysis.

"[T]he personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal quotation marks omitted). Ultimately, a plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). An individual's "[p]ersonal involvement can be shown by: 'evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that

unconstitutional acts were occurring." *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 127 (2d Cir. 2004) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 [2d Cir. 1995]). To adequately allege "[p]ersonal involvement ... by 'direct participation,'" a plaintiff must demonstrate "'intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Victory*, 814 F.3d at 67.

Plaintiff has at the very least raised a genuine dispute of material fact as to whether Defendant Mattice was personally involved in the alleged deliberate indifference to her medical needs. In particular, Plaintiff has adduced admissible evidence from which a rational factfinder could conclude that Plaintiff displayed symptoms of agitation and quality of speech that would identify her as a mentally distressed person in crisis at the time Defendant Mattice chose to transport her to the police station without checking whether she required medical attention for her mental and emotional symptoms. Defendant Mattice acknowledges that Plaintiff engaged in behavior including crying out for her "babies" on multiple occasions, repeatedly attempting to cross the police line and enter the burned house despite warnings to stop, and kicking the car door while inside the police car. (Dkt. No. 217, Attach. 20, at 3-4 [Mattice Aff.].) Additionally, the video and audio evidence substantiates that Plaintiff was agitated throughout the encounter, yelling, crying, repeating certain phrases multiple times, and making statements that were non-responsive to the officers' questions about her identity. Defendants do not appear to dispute that Defendant Mattice had the ability or authority to call medical responders to care for Plaintiff, or that Defendant Mattice was the person who arrested her rather than calling for such medical care. The Court therefore finds that there is at least a genuine dispute of material fact as to whether Defendant Mattice was personally involved in the alleged constitutional violation.

27

However, Plaintiff has not shown any personal involvement in the remaining claim as to Defendants DellaRocco and Faarstad. Both are members of the City of Schenectady Fire Department, and there is no evidence that they were involved in decisions regarding where to transport Plaintiff or that they engaged with Plaintiff beyond speaking with her when she first arrived at the scene. Rather, the evidence establishes that Defendant Mattice and Officer Giordano handled the bulk of the interaction with Plaintiff and were the individuals who took charge of asking her questions and transporting her to the police station. Plaintiff has not even alleged (much less established) any other way in which Defendants DellaRocco and Faarstad should be found to be personally involved in the denial of medical treatment.

For the above reasons, the Court grants Defendants' motion as to Defendants DellaRocco and Faarstad and dismisses those Defendants from this action. However, the Court denies Defendants' motion as to their argument that Defendant Mattice was not personally involved in the alleged constitutional violation.

**D.     Whether Defendants Are Entitled to Summary Judgment on the Merits of Plaintiff's Claim of Deliberate Indifference to Her Serious Medical Needs**

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 217 [Defs.' Mem. of Law]; Dkt. No. 238 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

"A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To establish such a claim, the pretrial detainee must satisfy a two-pronged test by

showing the following: (1) "the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process"; and (2) "the officer acted with at least deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29.

As to the first prong, a pretrial detainee must show that she suffered from a serious medical need. "The serious medical need standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles v. Orange Cnty*, 925 F.3d 73, 86 (2d Cir. 2019). "In determining whether a medical need is sufficiently serious to be cognizable as a basis for a constitutional claim for deprivation of medical care, we consider factors such as whether a reasonable doctor or patient would find the injury important and worthy of treatment, whether the medical condition significantly affects the individual's daily activities, and whether the illness or injury inflicts chronic and substantial pain." *Charles*, 925 F.3d at 86. Additionally, "the actual medical consequences that flow from the denial of care are highly relevant in determining whether the denial of treatment subjected the detainee to a significant risk of serious harm." *Charles*, 925 F.3d at 86.

As to the second prong, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see Charles*, 925 F.3d at 87 (noting that the objective deliberate indifference standard outlined in *Darnell* applies equally to cases alleging denial of medical treatment under the Fourteenth Amendment). "Whether the state knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the

usual ways, including inference from circumstantial evidence." *Charles*, 925 F.3d at 87.

The Court finds that it need not determine with particularity whether Plaintiff's TBI constituted a serious medical need at the time of her arrest and confinement at the police station (but assumes that it does) because she has raised no genuine dispute of material fact as to whether Defendants were deliberately indifferent to that medical need.

The Court notes at the outset that the only individual named Defendant remaining is Defendant Mattice, and it is undisputed on the record that Defendant Mattice did not have any further dealings with Plaintiff after he brought her to the police station and left her in the care of the employees there. Defendant Mattice therefore cannot be held liable for any conduct that occurred after that time; the relevant assessment is therefore whether he acted with deliberate indifference between the time Plaintiff arrived at the scene of the fire and when Defendant Mattice left her at the police station.

The Court finds that the evidence simply could not allow a reasonable fact finder to conclude that Defendant Mattice acted with deliberate indifference by failing to call for medical intervention. In particular, regardless of whether Defendant Mattice was specifically aware that Plaintiff had suffered a prior TBI, there is no evidence to establish that he knew or should have known that a TBI suffered multiple months before the incident in question would pose an excessive risk to Plaintiff's health and safety under the circumstances such that it would require medical care. As an initial matter, although Plaintiff informed Defendant Mattice that she had been at the hospital all day, such statement alone does not (for the reasons discussed previously) suggest that Defendant Mattice should have known that Plaintiff was in the hospital for any *treatment*, much less treatment specifically related to ongoing TBI symptoms.

Additionally, even if he had been informed that Plaintiff was in the hospital specifically to have an MRI related to her TBI, such knowledge still would not necessarily mean that he reasonably should have known that her TBI posed a serious risk to her health or safety, or that his failure to call an ambulance to provide medical care or take her to the hospital rose to a level akin to criminal recklessness. In particular, even if Defendant Mattice was aware that Plaintiff had a previous TBI, Plaintiff has offered no evidence, not even her own testimony in a deposition or affidavit, that she informed Defendant Mattice or anyone else on the scene that she was suffering from effects of her TBI that would merit medical attention, such as not feeling "well" as she reported to Ms. Reyes later at the police station. (Dkt. No. 217, Attach. 9, at 83:14-22 [Pl.'s Dep.]; Dkt. No. 217, Attach. 10, at 56:11-17, 60:1-10 [Pl.'s Dep.]; Dkt. No. 217, Attach. 11, at 39:12-17 [Pl.'s Dep.]; Dkt. No. 217, Attach. 16, at 112:12-24, 113:11-18, 116:1-9 [Reyes Dep.].) Furthermore, Plaintiff testified at her deposition, in response to a question as to whether she told the officers at the scene of the fire anything about how her TBI affected her or her functioning, that she just "answered their questions," that they "didn't ask me that," and that she did not recall or think that she told them such information because her focus was on getting help for her dogs. (Dkt. No. 217, Attach. 10, at 62:22-63:11, 64:4-10 [Pl.'s Dep.].) When asked whether there were any external manifestations of her TBI on the date in question, Plaintiff testified that her speech was "choppy," "repetitive," and not fluent, that she was shaking from the distress (although it is not clear whether she was testifying that she was shaking at the scene of the fire or only at the police station), and that she wore blue-tinted glasses and a visor due to light sensitivity. (Dkt. No. 217, Attach. 11, at 52:8-55:8, 66:3-13, 66:18-67:6 [Pl.'s Dep.].) The video evidence substantiates a finding that Plaintiff was yelling statements that were often repetitive or off-topic

to the context of the conversation the officers were attempting to have with her (but rather related to the need to help her dogs) and was generally in a state of emotional distress. The Court notes also that there is no evidence that Plaintiff suffered any blow, injury, or other trauma to her head or neck during the encounter with Defendant Mattice.

A reasonable factfinder could not, on this evidence, find that Defendant Mattice should have reasonably interpreted Plaintiff's signs of emotional distress as being related to her TBI specifically rather than the admittedly emotional circumstances surrounding the fire, or should have reasonably known that Plaintiff would be likely to suffer further cognitive or other harm from not being referred for medical care at that time. Because there is no genuine dispute of material fact as to whether Defendant Mattice acted with deliberate indifference to Plaintiff's TBI, the Court grants Defendant's motion as to the events that occurred before Plaintiff was left in the care of employees at the police station.

Additionally, even if the Court had previously allowed Plaintiff to amend her Complaint to add Ms. Reyes as a defendant, Plaintiff has not adduced sufficient evidence to create a genuine dispute of material fact as to whether the actions of Ms. Reyes or any other person at the police station acted with deliberate indifference to her serious medical needs during the time she was at the police station. In particular, for the reasons stated in Defendants' memorandum of law, Plaintiff has not shown that she was denied adequate medical care with respect to the emotional distress manifestations allegedly resulting from her TBI, and the Court notes in particular that police station employees called paramedics almost immediately after Plaintiff experienced the only manifestation that reasonably suggested the need for medical care, her syncopal episode. (Dkt. No. 217, Attach. 22, at 12-14 [Def.'s Mem. of Law].)

The Court agrees with Defendants that Ms. Reyes and other police station employees were not deliberately indifferent to Plaintiff's serious medical needs. It is undisputed that, based on her awareness of Plaintiff's TBI and the visible signs and symptoms of emotional distress, Ms. Reyes (a) physically checked on Plaintiff in her cell approximately every 15 minutes, and (b) continuously monitored Plaintiff between those checks through the surveillance footage of Plaintiff's cell. It is also undisputed that Ms. Reyes rushed to Plaintiff's aid upon noticing that she had fallen in her cell and almost immediately requested that the desk sergeant call paramedics; the desk sergeant called paramedics within four minutes of Plaintiff's fall. The fact that, before her syncopal episode, Ms. Reyes may have indicated that they would send Plaintiff to the hospital after they issued her an appearance ticket does not, by itself, constitute sufficient evidence to allow a reasonable factfinder to conclude that Ms. Reyes or any other police station employee knew that Plaintiff required prompt medical care but failed to provide it in a timely manner. However, once the situation changed and it became apparent that Plaintiff required care, such care was promptly provided. Plaintiff therefore has not raised a genuine dispute of material fact as to whether any of the employees at the police station were deliberately indifferent to her medical needs.

For all of the above reasons, the Court finds that Plaintiff cannot establish that any individual Defendants were deliberately indifferent to her medical needs; Defendants' motion for summary judgment on this point is therefore granted.

### E. Whether Defendants Are Entitled to Summary Judgment on Plaintiff's Claim of Municipal Liability Against the City of Schenectady and the City of Schenectady Police Department

After careful consideration, the Court answers this question in the affirmative for the

reasons stated in Defendants' memoranda of law.  (Dkt. No. 217 [Defs.' Mem. of Law]; Dkt. No. 238 [Defs.' Reply Mem. of Law].)  To those reasons, the Court adds the following analysis.

Because the Court has already found that Plaintiff has not established a constitutional violation on her only remaining claim, the Court must also find that there is no municipal liability.  *See Kamholtz v. Yates Cnty*, 350 F. App'x 589, 592 (2d Cir. 2009) ("As we find there was no constitutional deprivation of appellant's rights, his claims of municipal liability necessarily fail."); *accord Bonilla v. Jaronczyk*, 354 F. App'x 579, 582 (2d Cir. 2009); *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).  As a result, Defendants City of Schenectady and City of Schenectady Police Department are dismissed from this action.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 217) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 8) is **DISMISSED**.

Dated: November 14, 2019
      Syracuse, NY

Hon. Glenn T. Suddaby
Chief U.S. District Judge